UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E2W, LLC, a Delaware limited liability
company,

                       Plaintiff,

      v.

KIDZANIA OPERATIONS, S.A.R.L., a
Luxembourg corporation.

                     Defendant.

Docket No. 1:20-cv-_____

**COMPLAINT**

---

Plaintiff E2W, LLC ("Plaintiff" or "E2W") by and through its undersigned counsel, complains and alleges as follows:

1.    Plaintiff is, and at all times material hereto was, a Delaware limited liability company with its principal place of business located in Texas.

2.    Upon information and belief, Defendant KidZania Operations, S.a.r.l. is a Luxembourg corporation with a principal place of business located in Luxembourg or in Mexico City, Mexico.

3.    Jurisdiction and venue are appropriate in this Court because there is complete diversity between the parties and the amount in controversy exceeds $75,000.  Further, jurisdiction and venue are also appropriate in this District because Defendant expressly consented to this jurisdiction and venue in this District in written agreements.

## GENERAL ALLEGATIONS

4.    Plaintiff is a franchisee pursuant to a written Franchise Agreement dated December 21, 2015, as amended (the "Franchise Agreement"), for the Territory of the United

States of America, by and between KidZania Operations, S.a.r.l. ("Franchisor") and E2W. Capitalized words used herein have the same meanings as provided in the Franchise Agreement unless designated otherwise.

5.     Franchisor owns and licenses the rights to operate KidZania facilities, which are children-based amusement parks consisting of a themed replica of a realistic city environment, with buildings and streets, containing real world businesses, products and services such as shops, theaters, stores, restaurants, utilities, health and safety entities, vehicles and pedestrians in which children role play professionals, job and/or career oriented activities associated with events within the facility and which are designed and programmed to mimic the real-life and inner workings of a typical city ("KZ Facilities").

6.     Pursuant to the Franchise Agreement, E2W was granted the rights to open and operate KZ Facilities in the United States.

7.     E2W paid KidZania over $3,000,000 for the development and operation rights, as well as $500,000 per KZ Facility and royalties and other fees.  Franchise Agreement, § 7.

8.     E2W agreed to open and operate up to at least 10 KZ Facilities in the United States, with a specific schedule to open the first four KZ Facilities, with the first to be opened by March 31, 2018, and the second KZ Facility to be opened 24 months after opening the first, and the next two not later than 18 months after opening the prior KZ Facility.  Franchise Agreement, § 4.3.

9.     In the event of delay in opening, the parties agreed to certain extensions and payments to address the same.  This includes paying a pro-rated amount calculated at 125% of the Annual Minimum Guaranteed Royalty of at least $750,000.  Franchise Agreement, § 7.5.c.

10.     The parties further agreed that a pandemic like COVID-19 would relieve the parties

of the obligation to perform and liability for failure to perform in the Franchise Agreement's

definition of Force Majeure and in § 18.5 of the Franchise Agreement:

> "Force Majeure" means an event beyond the reasonable control of the Parties, including, but not be limited to, riots, civil commotion, wars, hostilities between nations, laws, governmental orders or regulations (including delays in governmental approvals despite, in the case of Licensee, its commercially reasonable efforts to overcome such delays as reflected in demonstrable evidence, but in such case subject to Section 18.5), embargoes, actions by government or by political sector(s) of their respective countries, acts of God such as earthquakes, floods or storms, fires, explosions, strikes, acts of terrorism or sabotage. Notwithstanding the foregoing, any government imposed restriction or exchange control that prevents Licensee from maintaining its legal authorization to conduct business, or from paying any sums required by this Franchise Agreement in the time and manner required hereunder shall not be construed as an event of Force Majeure, except as expressly provided in Section 18.5.

Franchise Agreement, § 1.

18.5   Force Majeure.

a)      Neither Party shall be responsible for any failure or delay in performing any of its obligations hereunder if such delay or failure is due to a Force Majeure that cannot be removed or cured by the affected Party, provided however that:

i.      the affected Party shall only be relieved of the affected duties and/or obligations for so long as the Force Majeure continues, and

ii.     the affected Party must use commercially reasonable efforts to remove or cure the Force Majeure if such is reasonably capable of being removed or cured.

iii.    Licensee's failure to secure Regulatory Approval shall not be deemed to constitute an event of Force Majeure unless (a) such failure is not the result of the acts or omissions of Licensee, and (b) Licensee diligently pursues such Regulatory Approvals until such approvals are approved.

b)      In the event that the Force Majeure results in the closure of all Licensee KZ Facilities in the Licensed Territory for more than six (6) months, then, without limiting any of KidZania's other remedies hereunder, KidZania may terminate Licensee's rights hereunder and/or terminate Licensee's exclusivity in the Licensed Territory hereunder upon thirty (30) days written notice to Licensee.

c)      Notwithstanding anything herein to the contrary, for all periods of Force Majeure which may cause delay in the Commercial Opening of any Licensee KZ Facility, Licensee shall nonetheless be obligated to make all payments due under Section 7.5(c) above. In the event of a Force Majeure following the Commercial Opening [sic] any one

or more Licensee KZ Facilities causing the closure of all such Licensee KZ Facilities, the Minimum Guaranteed Royalty shall continue to accrue under the provisions of Section 7.5(a) and Licensee shall be obligated to make payment as set forth therein.

Franchise Agreement, § 18.5.

11.     E2W and its subsidiary, Educity Park Frisco, LLC ("Educity Frisco") developed and opened the first KZ Facility in Stonebriar Centre in Frisco, Texas ("Frisco Facility"). However, due to delays in funding and then construction delays, the construction and opening of the Frisco Facility was delayed and the Frisco Facility did not open until November 18, 2019.

12.     Effective February 19, 2019, the parties entered into a second amendment to the Franchise Agreement (the "Second Amendment") in which they agreed to a compromise relating to the Minimum Guaranteed Royalty obligation arising from the delayed opening of the Frisco Facility.  Specifically, the parties agreed that "solely for the First Licensee KZ Facility, Licensee shall pay the fixed amount of $750,000 (seven hundred and fifty-thousand U.S. Dollars) for the Delayed Opening Period between 1st October 2018 and 31st October, 2019" in four equal installments of $187,500 due on March 31, 2019, July 31, 2019, October 31, 2019 and December 31, 2019 (the "Settlement Payments").

13.     In addition, E2W and Educity Frisco incurred substantial expenses and liabilities leasing the space, designing the space, and building the Frisco Facility, as well as preparing for operations, among other actions.

14.     Educity Frisco entered into a lease with Stonebriar Mall, LLC ("Stonebriar"). Franchisor approved the location and the lease.

15.     Educity Frisco entered into a contract with Design Republic Partners Architects, LLP ("Design") as architect and a construction contract with Turner Construction Company ("Turner") as general contractor.  Franchisor assisted with the design of the Frisco Facility and

73005603.5

approved the architectural plans and designs, and approved Turner as the general contractor.

16.     Construction on the Frisco Facility began in and around November, 2018 and was completed in October, 2019 and opened for business in November, 2019.  In all, Turner as general contractor charged Educity Frisco approximately $20,000,000 and Educity Frisco has spent over $13,000,000 on additional vendors and contractors to complete the project.

17.     E2W required additional capital to pay for the build-out and working capital for obligations like rent, the Settlement Payments, royalties and other fee payments to the Franchisor on a going-forward basis.  Throughout 2019 and 2020, in order to address the funding needed for the Settlement Payments and the development of the required KZ Facilities, including the design and construction-related payments coming due or overdue, as well as obligations to the landlord and Franchisor, E2W and Franchisor engaged in continuous negotiations with various financing sources including, but not limited to, Winter Capital, The Carlyle Group, Decisive Wealth S.A., Brookfield Properties Retail, Inc. ("Brookfield Properties"), Centennial Real Estate ("Centennial") and USAA Real Estate Company ("USAA").  In particular, E2W and Franchisor signed terms sheets with Brookfield Properties on March 6, 2020 and USAA on March 3, 2020 for such funding purposes.  E2W and Franchisor agreed that payment of the Settlement Payments would be made at the closing on such financing arrangements.

18.     During 2019 and 2020, E2W was also actively engaged with Franchisor and landlords to design and then build out KZ Facilities in Chicago, Los Angeles, and New Jersey. However, Franchisor failed to comply with the applicable laws governing the offer and sales of franchises in those states.  This further necessitated the need for E2W to obtain financing.

19.     With respect to the potential Winter Capital investment, Gevork Sarkisyan ("Sarkisyan") (who has a controlling interest in E2W's parent company and is a manager of E2W)

and Alexey Bashkirov ("Bashkirov") of Winter Capital (Winter Capital is also an owner of E2W's parent company), were negotiating the valuation of E2W, which would dilute Sarkisyan's ownership interest if Winter Capital made the contemplated substantial investment, a point on which Sarkisyan and Bashkirov disagreed.

20.     The Chief Executive Officer and founder of Franchisor, Xavier Lopez Ancona ("Lopez"), is a long-time very close friend and business partner with Sarkisyan.  Through this relationship, a special relationship of trust and confidence was created and developed. Sarkisyan and E2W reasonably believed and understood that Lopez and Franchisor were not mere arms-length business partners, but rather were looking out for Sarkisyan's and E2W's best interests. The other members, managers and officers of E2W similarly reasonably understood that through this relationship between Sarkisyan and Lopez, the Franchisor and E2W enjoyed a special relationship of trust and confidence.

21.     Sarkisyan confided in Lopez regarding the valuation disagreement and the dilution of his interests, if the parties agreed to the terms Winter Capital was proposing. Sarkisyan told Lopez that while he would prefer not to be diluted, if the Franchisor required its Settlement Payments at that time and/or was concerned about E2W's financial position vis-a-vis its various creditors, he would accept the Winter Capital deal and resulting dilution, which would allow E2W to pay E2W's creditors including the Franchisor.  Lopez advised Sarkisyan and E2W not to accept the Winter Capital proposal and rather, to look for other financing opportunities.  Lopez expressly assured Sarkisyan that E2W was in no peril of losing its franchise rights, and that the Franchisor "had its back" and would be "patient" and allow E2W to pursue other potential sources of funding which in turn E2W proceeded to do.

22.     In the Fall of 2019, E2W provided additional updates to Franchisor of its financial

position and growing need for additional capital in the near term.  E2W continued to discuss and seek the Franchisor's guidance with respect to accepting Winter Capital as an available resource for capital to make the payments pursuant to the Franchise Agreement and to other creditors.  The Franchisor continued to provide E2W with such guidance.

23.     In an in-person meeting in Dallas in October 2019, Sarkisyan, Lopez, Bashkirov, Sandeep Mathrani (then CEO of Brookfield Retail), Keith Rubenstein (a manager of E2W and an owner of E2W) and Greg Stevens ("Stevens") (E2W's CEO) discussed the status of E2W's financial position, and specifically the increasing demands from creditors and lienholders based upon liens that were being filed against the Frisco Facility.  The Franchisor stated that it was not concerned and continued to recommend pursuing alternative financing.  They also discussed the Winter Capital offer to invest and the valuation proposed in connection therewith. Nonetheless, Franchisor continued to support pursuing alternative financing.

24.     On December 18, 2019, Bashkirov flew to Mexico City to meet with representatives of Franchisor regarding Winer Capital's desire for agreements to address the companies' capital needs and continued willingness to make the substantial investment if terms can be agreed with Sarkisyan.  Franchisor and Lopez understood that this opportunity was still at that time viable.

25.     Nonetheless, throughout the Fall and Winter of 2019, both before and after the December meeting with Bashkirov, and consistently through March 30, 2020, Franchisor continued to advise E2W to put aside the Winter Capital financing opportunity and instead advocated that E2W seek financing through other sources, ultimately supporting and working with E2W for the above-mentioned financing agreements with Brookfield Properties and USAA involving financing sufficient to pay off creditors, including the Franchisor, and development and

build-out of additional KZ Facilities in California and Illinois. (Brookfield Properties is the ultimate parent of Stonebriar, as well as the entity that owns the property of the KZ Facility to be opened in Chicago, while USAA and its joint venture partner Centennial were intending to lease property for the KZ Facility in California and elsewhere).

26. The Franchisor repeatedly told principals of E2W that it supported the efforts to obtain other financing and in that context created the reasonable belief of E2W and its management and owners that it would not terminate the Franchise Agreement for non-payment while E2W and it pursued and negotiated terms for that financing. At a minimum, based on the representations of the Franchisor, E2W and its management reasonably believed that if the Franchisor changed its position in this regard, it would provide some advance notice and a reasonable opportunity to make other arrangements to make the Minimum Guaranteed Royalty payment.

27. By letter dated December 9, 2019, the Franchisor memorialized its agreement that, given the recent discussions, it was granting an extension to January 31, 2020 for E2W to make the Settlement Payments due under the Second Amendment.

28. In and around this time, Winter Capital was attempting to enforce certain step-in rights to control the parent of E2W, in which it is a substantial owner. It maintained that its step-in rights were triggered by a default in the Franchise Agreement. Sarkisyan requested that the Franchisor send the December 9 letter to clarify that E2W was not in default. Lopez confirmed to Sarkisyan that day that the December 9 letter was solely an effort to memorialize the terms of the arrangement and that in light of the then-pending negotiations with USAA and Brookfield Properties, E2W had nothing to worry about. He repeated that Franchisor would be patient but that it was interested in pushing the parties to complete negotiations.

29. Specifically, starting in December 2019 and throughout January, February and into

March, 2020, the Franchisor and E2W on one hand, and USAA and Brookfield Properties on the other hand, were negotiating terms under which USAA and Brookfield Properties would provide financing in the form of tenant allowance and loans collectively over $70,000,000 to E2W (the "Financing Transaction").

30.     The terms of the Financing Transaction included $10,000,000 from Brookfield Properties that, coupled with required capital from E2W's parent, respectively, would primarily be used to pay the obligations to Franchisor, Stonebriar, Turner, other construction creditors.  The terms also included USAA providing over $45,000,000 that would be used for build-out of a new facility in the Los Angeles, California area and for working capital.  The Transaction provided an additional $10,000,000 to start the build-out of another KZ Facility in Chicago.

31.     From January through at least March 6, 2020 the parties were negotiating the terms of the Financing Transaction.  On March 3 and 5, respectively, USAA and Brookfield Properties reached agreed terms with E2W and Franchisor.  On March 17, the parties agreed the funds to be paid to Franchisor for the Settlement Payments would be wired to Franchisor at closing.  From March 3 through March 23, the parties were negotiating the definitive agreements; however, the outbreak of COVID-19 had been disrupting businesses everywhere, including E2W's business both at the Frisco Facility and its development efforts in Illinois, California, and New Jersey.

a)     The first known COVID-19 case in the United States presented on January 19, 2020.  The World Health Organization declared COVID-19 to be a Public Health Emergency of International Concern on January 30, 2020, and a pandemic on March 11, 2020.  On March 13, 2020, President Trump declared a national emergency in the United States due to the COVID-19 outbreak.  As of April 3, 2020, over 250,000 COVID-19 cases

have been reported in the United States, including in Texas, California, Illinois, New York and New Jersey.

b)      Government orders, regulations and restrictions requiring social distancing and restrictions on business further required cessation of business.

c)       On March 30, 2020, President Trump extended national social distancing protocol to April 30, 2020.  On March 31, 2020, the Governor of Texas issued an Executive Order directing all Texans to minimize non-essential gatherings and in-person contact with people not in the same household at least through April 30, 2020 (which has been extended to May 20, 2020).  Violation of the March 31 order is punishable by a fine of up to $1,000 and/or up to 180 days of jail time.

d)      On March 19, 2020, California issued an Executive Order ordering all individuals living in the State of California to stay at home or at their place of residence until further notice.

e)      On March 20, 2020, the State of Illinois ordered all Illinois residents to "shelter in place" through at least April 30, 2020.

f)      On the same date, New York issued the "New York State on Pause" Executive Order, a 10-point policy, which, among other social distancing and travel restrictions, requires everyone to maintain a 6-foot distance in public and limits individuals to using public transportation only when absolutely necessary.

g)      On March 21, 2020, New Jersey issued Executive Order No. 107 requiring all New Jersey residents to remain at their home or place of residence unless they are obtaining essential goods or services. In the same Executive Order, New Jersey ordered that all gatherings of individuals be cancelled and violators of the stay at home order face

penalties of up to 6 months in jail and/or a $1,000 fine. Executive Order No. 107 remains in effect until revoked or modified.

32.     COVID-19 precipitated such laws, government orders, regulations and restrictions, which have continued to reinforce and necessitated the closure of the Frisco Facility in the interest of protecting the children coming to the Frisco Facility and the cessation of Development Activities.

33.     By correspondence dated February 6, 2020, the Franchisor purported to provide notice of the default by E2W of failure to pay the Settlement Payments and providing 30 days to cure.

34.     Before the Franchisor sent the correspondence on February 6, 2020, Lopez and Sarkisyan discussed it and agreed that sending the notice would assist Sarkisyan, E2W and the Franchisor in their efforts to motivate all concerned to complete the investment transactions timely. Sarkisyan and the Franchisor specifically agreed that the Franchisor send the notice for this purpose.  During this conversation, the Franchisor affirmatively assured E2W that it was sending the correspondence solely for the purpose of causing all concerned to speed up the process of securing the Financing Transaction, and for no other purpose.  It made clear that it would not rely on the February 6, 2020 correspondence for the termination of the Franchise Agreement.

35.     Sarkisyan again told Lopez that he, Sarkisyan, would agree to the capital infusion by Winter Capital even though the valuation Winter Capital was proposing resulted in substantial dilution of Sarkisyan's equity in E2W, in order for E2W to address its financial obligations, including to the Franchisor, if Lopez and the Franchisor directed him to so agree.  Lopez again unequivocally told Sarkisyan that he supported the financing through Brookfield and USAA over a deal with Winter Capital.  As Lopez said, he "had [Sarkisyan's] back" and Franchisor would

support other financing even if it meant delays in E2W making payments to Franchisor.

36.     On March 23, 2020, Brookfield Properties contacted E2W and indicated that due to the outbreak of COVID-19 and resulting government orders, its revenue and future revenue and asset values were diminished and uncertain, and it consequently was withdrawing its agreement to the signed term sheet for the Financing Transaction.

37.     On March 23, 2020, after Brookfield Properties indicated that due to COVID-19 it was not in position to follow through on the financing package that Franchisor and E2W had been negotiating, principals of the Franchisor and E2W participated in calls with Steve Levin ("Levin") the CEO of Centennial (who represented Centennial and USAA's interest) in which Levin indicated his willingness to provide the USAA financing contemplated in the signed terms sheet but likely under new terms.  Specifically, on March 25, 2020, Levin, Lopez and Sarkisyan spoke and, on March 26, 2020, Stevens and Levin spoke.  The parties discussed alternatives that included adding to the deal that they change the Chicago area KZ Facility to a Centennial location and/or opening in California under a new entity, with USAA providing the funding for both the California and the Chicago facilities, as well as providing the capital to address creditors associated with the Frisco Facility and the obligations to Franchisor.

38.     Throughout the week of March 23, 2020 Lopez specifically stated that Franchisor supported these concepts and that the Franchisor would work with E2W to facilitate.  Lopez told Sarkisyan that he supported this approach and made personal calls to Centennial in support.  He further made clear that the Franchisor would be patient for its payments from E2W as the efforts with USAA continued.  Likewise, the Franchisor's COO, Hernon Barbieri ("Barbieri"), indicated support of the plan to pursue the deal with Centennial and USAA.

39.     Stevens also told Barbieri that E2W was not in position to pay the Minimum

73005603.5

Guaranteed Royalty until it was able to confirm the funding arrangement with Centennial and USAA or others and assess its various obligations and the future impact of COVID-19. Given that E2W's liabilities exceeded its assets and had been forced to close the Frisco Facility due to COVID-19 and was drawing no revenue, Stevens understood that E2W (and its officers and managers) as a matter of its legal duty to its creditors, would not plan to make payments favoring one creditor over another and so advised Franchisor. Again, Barbieri indicated support to pursue the Centennial and USAA deal.

40.     Neither in that conversation nor at any other time did the Franchisor object or make a demand for payment. Rather, Franchisor continued supporting the efforts to do a deal with Centennial and obtain the USAA financing, which was going to take more time.

41.     E2W reasonably relied on these statements and omissions in the face of these repeated assurances in not making the Minimum Guaranteed Royalty payment.

42.     Incredibly, without notice that it was changing its position, the Franchisor sent correspondence on the evening of March 30, 2020 purporting to terminate the Franchise Agreement.

43.     By correspondence dated April 3, 2020, E2W informed the Franchisor that the Franchisor did not have the right or legal ability to terminate the Franchise Agreement and made demand that Franchisor withdraw the March 30, 2020 correspondence and acknowledge that the Franchise Agreement remains valid and in full force and effect. (A copy of E2W's letter of April 3, 2020 to the Franchisor is attached hereto as Exhibit "A".)

44.     To date, Franchisor has not provided a substantive response.

45.     In the Franchise Agreement, the Parties agreed to arbitrate with the International Chamber of Commerce ("ICC") "[a]ny dispute arising out of or in connection with th[e] Franchise

Agreement or the interpretation of [it], including with respect to its existence, validity or termination…in accordance with the ICC Rules of Arbitration in effect at the time of the arbitration." Franchise Agreement, § 19.6.

46.     Consistent therewith, E2W is commencing an arbitration proceeding with the ICC seeking permanent injunctive relief and other relief and asserting additional substantive claims. Pursuant to Rules 28.2 of the ICC Rules of Arbitration, E2W is seeking preliminary injunctive relief pending the outcome of the arbitration in this lawsuit.

## FIRST CAUSE OF ACTION
### (Preliminary Injunctive Relief)

47.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

48.     There is a dispute as to whether Franchisor has the right to terminate the Franchise Agreement based on its inequitable and bad-faith conduct, as described in the preceding paragraphs.  That dispute (and other issues) will be the subject of the ICC arbitration that E2W is commencing.

49.     E2W would be immediately and irreparably harmed if Franchisor were permitted to terminate the Franchise Agreement prior to the ICC's ruling on this issue.  For the reasons described above, E2W has a likelihood of success on the merits of its claims and/or there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in favor of E2W.

50.     Accordingly, E2W seeks a preliminary injunction:  (i) restraining and enjoining the Franchisor and its agents, employees, and affiliated companies under its control from terminating the Franchise Agreement, from taking any actions that would interfere with the continued operations of E2W, and from indicating to any third party that the Franchise Agreement has been

73005603.5

terminated; and (ii) to otherwise maintain the status quo related to the operating relationship between the Franchisor and E2W until this matter and all claims that are asserted or may be asserted may be heard and decided in the ICC arbitration.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

51.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

52.     Plaintiff entered into the Franchise Agreement with Defendant.

53.     Plaintiff has fully complied with and has performed all conditions and covenants on its part to be performed under the Franchise Agreement, or the same are excused.

54.     Specifically, the Force Majeure clause, as well as the doctrines of supervening impossibility and frustration of purpose, excuse contractual performance.  The ability of E2W to perform is impracticable without E2W's fault by the occurrence of COVID-19, the non-occurrence of which was a basic assumption on which the contract was made.

55.     E2W cannot operate the Frisco Facility, or make any payments to Franchisor while the Frisco Facility is not in operation and it is without the financing it had been negotiating, all due to the COVID-19 pandemic.  Further, due to the COVID-19 pandemic, E2W cannot continue Development Activities.   The non-occurrence of a worldwide pandemic necessitating the indefinite closure of the Frisco Facility and the cessation of Development Activities was a basic assumption of the Franchise Agreement.  Therefore, E2W is discharged from any duty to perform under the Franchise Agreement for the foreseeable future due to the COVID-19 pandemic.

56.     Moreover, Franchisor is estopped from terminating, and it waived the right to terminate, the Franchise Agreement under the facts set forth herein, including its statements, conduct and omissions.

57.     Despite due demand, the above breaches of the Franchise Agreement have not been cured.

58.     As a direct result of the bad faith and willful breaches of the Franchise Agreement, and the covenant of good faith and fair dealing implied therein by the Franchisor, E2W has suffered actual injury.

59.     The Franchisor breached the Franchise Agreement by attempting to terminate it under these circumstances (and other reasons that would be subject to the arbitration), causing immediate and irreparable harm to E2W.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

(i)     a preliminary injunction restraining and enjoining the Franchisor and its agents, employees, and affiliated companies under its control from terminating the Franchise Agreement, from taking any actions that would interfere with the continued operations of E2W, and from indicating to any third party that the Franchise Agreement has been terminated;

(ii)     a preliminary injunction to otherwise maintain the status quo related to the operating relationship between the Franchisor and E2W until this matter and all claims that are asserted or may be asserted may be heard and decided in the ICC arbitration;

(iii)     granting costs and expenses, including attorneys' fees; and

(iv)     such other and further relief as this Court deems just and proper.

Dated:  New York, New York
       April 6, 2020

Respectfully submitted,

_____

Gabriel Levinson, Esq., #3059243
Darnell S. Stanislaus, Esq., #DS8683
POLSINELLI PC
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
glevinson@polsinelli.com
dstanislaus@polsinelli.com

Leonard H. MacPhee, Esq.*
Colorado Bar Number: 27753
POLSINELLI PC
1401 Lawrence Street, Suite 2300
Denver, Colorado 80202
Telephone: (303) 572-9300
Facsimile:  (303) 572-7883
lmacphee@polsinelli.com

*PHV Application Forthcoming

***Attorneys for Plaintiff***
***E2W, LLC***